912 P.2d 581

**John M. RIFE, Appellant–Appellant,**

**v.**

**Lorraine AKIBA,[1] Director of Department of Labor and Industrial Relations, and Pentagram Corporation, Appellees–Appellees.**

**No. 17435.**

Intermediate Court of Appeals of Hawai'i.

Feb. 28, 1996.

Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Akiba has been substituted automatically for the Appellee–Appellee in this case.

Tucker A. Dacey, Legal Aid Society of Hawaii, on the briefs, Kaneohe, for appellant-appellant.

Susan Barr and Robyn M. Kuwabe, Deputy Attorneys General, on the brief, Honolulu, for Department of Labor and Industrial Relations, appellees-appellees.

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

BURNS, Chief Judge.

Appellant John M. Rife (Rife) was employed by the Pentagram Corporation, doing business as a Burger King restaurant (Employer), from August 1991 until September 25, 1992, when he terminated his employment. On September 30, 1992, Rife applied to the State of Hawai'i Department of Labor and Industrial Relations (the Department) for unemployment benefits. The Department's claims examiner denied the application on October 27, 1992. Rife appealed. On November 30, 1992, after a hearing on November 23, 1992, the appeals officer affirmed. Rife appealed. On August 31, 1993, after a hearing on July 19, 1993, the circuit court affirmed. Rife appealed. We vacate and remand.

## THE LAW GOVERNING APPELLATE REVIEW

Hawai'i Revised Statutes (HRS) § 91–14(g) (1993) governs each court called upon to decide an appeal of an agency decision. *Dole Hawaii Division—Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). HRS § 91–14(g) states as follows:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petition-

ers may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Rife asks us to reverse the Department's decision.

We do not reach the HRS § 91-14(g)(5) issue. We vacate and remand pursuant to HRS § 91-14(g)(1) because the Department failed to satisfy HRS § 91-12 (1993).

## THE APPLICABLE LAW

Hawai'i's Employment Security Law states in HRS § 383-30 (1993) various disqualifications for benefits. One of those disqualifications is stated in HRS § 383-30(1) in relevant part as follows:

Disqualification for benefits. An individual shall be disqualified for benefits:

(1) Voluntary separation.... For any week beginning on and after October 1, 1989, in which the individual has left the individual's work voluntarily without good cause, and continuing until the individual has, subsequent to the week in which the voluntary separation occurred, been paid wages in covered employment equal to not less than five times the individual's weekly benefit amount as determined under section 383-22(b).

■ Although the employer usually has the burden of proving the relevant facts, *National Tire of Hawaii, Ltd. v. Kauffman*, 58 Haw. 265, 567 P.2d 1233 (1977), the employee has the burden of establishing that the voluntary termination was with good cause. *Noor v. Agsalud*, 2 Haw.App. 560, 562, 634 P.2d 1058, 1060 (1981).

HRS § 383-30(3)(A) defines the existence of good cause as follows:

(A) In determining whether or not any work is suitable for an individual there shall be considered among other factors ..., the degree of risk involved to the individual's health, safety, and morals, the individual's physical fitness and prior training, the individual's experience and prior earnings, the length of unemployment, the individual's prospects for obtaining work in the individual's customary occupation, the distance of available work from the individual's residence, and prospects for obtaining local work. The same factors so far as applicable shall be considered in determining the existence of good cause for an individual's voluntarily leaving work under paragraph (1).

The Administrative Rules of the Unemployment Insurance Division of the Department state in Title 12, Chapter 5, in relevant part as follows:

§ 12-5-47 *Voluntary Separation.* (a) An individual shall be disqualified for benefits for voluntarily leaving work without good cause.

(b) A separation is a voluntary leaving or quitting when the facts and circumstances demonstrate that a claimant is the "moving party" in the termination of an employment relationship.

(c) Generally, a leaving of work is considered to be for good cause where it is for a real, substantial, or compelling reason, or a reason which would cause a reasonable and prudent worker, genuinely and sincerely desirous of maintaining employment, to take similar action. Such a worker is expected to try reasonable alternatives before terminating the employment relationship. Good cause for leaving employment may be found where there is:

(1) Change in working conditions and the change is prejudicial or detrimental to the health, safety, or morals of the claimant;

(2) Change in terms and conditions of employment including but not limited to: change in rate of pay, position or

grade, duties, days of work, or hours of work;

(3) Discrimination which violates federal or state laws regarding equal employment opportunity practices;

(4) Change in employee's marital or domestic status;

(5) Acceptance of a definite, firm offer made of other employment where the offer is subsequently withdrawn and the former employer refuses to rehire the employee;

(6) Retirement under a mandatory requirement imposed by a collective bargaining agreement; or

(7) Any other factor relevant to a determination of good cause.

HRS § 91–12 (1993) states in relevant part as follows:

**Decisions and orders.** Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law.

The Hawai'i Supreme Court interpreted HRS § 91–12 and held:

All that is required is that the agency incorporate its findings in its decision. In so doing, however, the agency must make its findings reasonably clear. The parties and the court should not be left to guess, with respect to any material question of fact, or to any group of minor matters that may have cumulative significance, the precise finding of the agency.

*In re Terminal Transp., Inc.,* 54 Haw. 134, 139, 504 P.2d 1214, 1217 (1972) (citations omitted).

There are very practical reasons for requiring an agency's findings and conclusions upon all material issues of fact, law, or discretion to be stated in its decisions. As Professor Davis, in his well-known *Administrative Law Treatise,* has stated:

The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearing and judicial review, and keeping agencies within their jurisdiction.

Much the most prominent reason discussed in judicial opinions, . . . is the facilitation of judicial review. A simple illustration will readily show the need for findings as an aid to judicial review. A statute provided that no milk license should be granted unless the commissioner "is satisfied that the applicant is qualified by character, experience, financial responsibility and equipment to properly conduct the proposed business, that the issuance of the license will not tend to a destructive competition in a market already adequately served, and that issuance of the license is in the public interest." For the court to review a bulky record without knowing which of the six factors the commissioner found to be lacking would obviously be wasteful. Hardly surprising was the court's holding that "Only after the commissioner has made findings of fact can the court decide whether the findings are sustained by the evidence. . . ." . . .

The language of Mr. Justice Cardozo, in a case in which the Court could do no more than get an impression that the Commission may have acted properly, is often quoted: "The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. . . . We must know what a decision means before the duty becomes ours to say whether it is right or wrong." . . .

A second practical reason for requiring findings—preventing judicial usurpation of administrative functions—applies to administrative agencies with much greater force than it does to trial courts sitting without juries. The basic difference is that the limitations on fact-finding by the reviewing court are greater when administrative action is reviewed than when judicial action is reviewed. No serious harm is done if an appellate court after reversing the trial court's determination of law makes the necessary findings and applies

the right law so as to render a judgment. But when an agency because of erroneous law makes findings on the wrong issues, the reviewing court would usurp the administrative power if it were to make its own findings. The Supreme Court has stated the applicable principle: "Where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury. Like considerations govern review of administrative action." ...

A third practical reason for administrative findings is that findings help protect against careless or arbitrary action. Judge Frank gives this element first place: "It is sometimes said that the requirement that the trial judge file findings of fact is for the convenience of upper courts. While it does serve that end, it has a far more important purpose—that of evoking care on the part of the trial judge in ascertaining the facts." Courts sometimes assert that the requirement of administrative findings is "to assure against Star chamber methods." That language may seem rather strong, but Mr. Justice Douglas in a dissenting opinion has declared: "Unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion. Absolute discretion, like corruption, marks the beginning of the end of liberty." ...

The fourth practical reason for findings is to help parties plan their cases for rehearings and for judicial review.... [A] disappointed party, whether he plans further proceedings or not, deserves to have the satisfaction of knowing why he lost his case....

A fifth practical reason for findings, often stressed in judicial opinions, is to keep the agencies within their jurisdiction. A good example is a 1957 decision setting aside an ICC order which, on the basis of a finding that the existing rail service was

reasonably adequate, denied a motor carrier certificate. The Supreme Court pointed out the Commission's failure to make an evaluation of the "inherent advantages" of the motor carrier service proposed by the applicant: "For example, the Commission has not determined whether there are benefits that motor service would provide which are not now being provided by the rail carriers, whether certification of a motor carrier would be 'unduly prejudicial' to the existing carriers, and whether on balance the public interest would be better served by additional competitive service." The Commission's failure to evaluate advantages of the proposed service, including possibly reduced rates, was held to run counter to the National Transportation Policy.

2 Kenneth Culp Davis, *Administrative Law Treatise* § 16.05 (1958) (footnotes omitted).

## THE FACTUAL BACKGROUND

The evidence on the record was presented by Rife. When Rife began working for Employer in August 1991, he started in the management training program. At the time he quit, he was a restaurant manager at Employer's unit at the Kaneohe Marine Corps Air Station (KMCAS). He was an overtime-exempt employee, paid $26,000 per year.[2] However, when Employer hired him, it orally promised him that he would work only forty hours a week.

Employer's unit at the KMCAS was a refurbished school bus (the Bus). Once in April 1992 and once in May 1992, Rife was under a doctor's care as a result of heat exhaustion and stress related to the working conditions. During the period from June through September 10, 1992, the Bus caught fire three times. There is no evidence of the cause of the first two fires. The third fire, which occurred on September 10, 1992, but before Rife gave notice, "started because someone left a steel brush in the broiler the night before and it caught fire when the broiler was used the next day."

Employer had led Rife to believe that the Bus would be replaced in August 1992 with a

2. Hawai'i Revised Statutes § 387–1(1) (1993) excludes from the definition of "Employee" any individual employed at a guaranteed compensation totaling $1,250 or more a month.

state-of-the-art facility. In August 1992, Rife's suspicions led him to be informed by KMCAS officials that Employer had decided to close its KMCAS unit. This experience convinced Rife that he could not trust Employer.

In the last week of August, Rife made his decision to quit. On September 10, 1992 Rife gave notice that he was terminating his employment but did not give any reasons.

In support of his claim for unemployment benefits, Rife, on September 30, 1992, wrote the following reasons why he quit:

1) Pentagram withdrew its awarded contract to build and operate a new Burger King Restaurant on KMCAS and was penalized by [KMCAS]. This means the existing restaurant must close in the near future and no comparable position (to run a new 'state of the art' B.K.) is available to me.

2) In late August the [District Manager] gave me a written warning forcing me to reduce the supervisory hours of the shift supervisors from 50 to 20 hours a week. He demanded that I add 10 hours per week to my own schedule (from 40 to 50 hours) at no additional compensation.

3) The [District Manager] continually lied to me about the status of contract negotiations for the new restaurant about my own compensation and about the present facility which had 3 fires in two months!

At the November 23, 1992 hearing, Rife testified that he quit his job for three reasons he had previously communicated to Employer. He described those three reasons as follows: (1) the "restaurant was a lunch wagon that was in disrepair, that was dangerous[;]" (2) the credibility gap created when Employer, which had led him to believe that a state-of-the-art unit would replace the Bus, did not tell him of its decision to cease doing business at KMCAS; and (3) "actually the straw that broke the camel's back[,]" was the increase, effective September 1, 1992, of his work hours by twenty-five percent, from forty to fifty hours per week, with no additional compensation, and the reduction of the hours of the three shift supervisors from fifty to twenty hours per week. Rife testified that his nine-to-five, Monday-through-Friday schedule was increased to an eight-to-six schedule.

Rife also testified in relevant part as follows:

MR. RIFE: So in effect, they do have to get rid of me—they did have to get rid of me. Because there was no—there was no job. This was my whole point.

APPEALS OFFICER HANAUMI: So—so if—if they—if they have to get rid of you, why you—do you make it so convenient for them?

MR. RIFE: In what sense?

APPEALS OFFICER HANAUMI: By leaving.

MR. RIFE: Because I have to find another job.

APPEALS OFFICER HANAUMI: Well, why don't you wait until you have such a job?

MR. RIFE: Well how could I do that?

APPEALS OFFICER HANAUMI: Uh—

MR. RIFE: Why should I do that?

\*    \*    \*    \*    \*    \*

APPEALS OFFICER HANAUMI: So why was it—why didn't you ask for some time off if you needed some time off to look for another job?

MR. RIFE: Because I felt it would be better to look for another job when I wasn't working for Burger King.

\*    \*    \*    \*    \*    \*

APPEALS OFFICER HANAUMI: Okay. But as far as uh, the bus uh, operation going uh, out of business is you don't know, right?

MR. RIFE: I—I do know it's going out of business. Yes that—

APPEALS OFFICER HANAUMI: When?

MR. RIFE: Uh, uh, that I do not know.

In his November 2, 1992 appeal of the Director's decision, Rife wrote in relevant part as follows:

I did not quit for personal reasons. I quit because the prospects for advancement that had been promised to me when I was

hired and subsequently promoted to Restaurant Manager at KMCAS evaporated through a combination of the company losing its bid at the base and the overall losses (failure) elsewhere. [Employer] has more than an eighty percent annual turnover among its Restaurant Managers and well over one hundred and fifty percent amongst its crew employees. It is a poorly managed foreign-owned company.

## THE DEPARTMENT'S DECISION

The Claim Examiner's October 27, 1992 decision denied Rife's application for the following reason: "The facts show that you did not exhaust all reasonable alternatives in an effort to maintain employment by informing the employer of your reason for quitting. Therefore you quit for personal noncompelling reasons which do not constitute good cause within the meaning of the law. You quit without good cause."

The Appeals Officer ignored the Claim Examiner's "exhaust all reasonable alternatives in an effort to maintain employment" reason. The Appeals Officer's November 30, 1992 Decision states in relevant part as follows:

The claimant appealed from a determination of the Department of Labor and Industrial Relations which disqualified the claimant for unemployment benefits beginning September 20, 1992, and continuing until the claimant is paid wages in covered employment equal to not less than five times the claimant's weekly benefit amount after September 26, 1992, on the basis that the claimant left employment without good cause.

*STATEMENT OF FACTS:*

The claimant, a restaurant manager from August 01, 1991 to September 25, 1992, voluntarily left his work after a three week notice. He was not satisfied with the environment and he felt that he was unfairly treated by the employer's decision to increase his hours from forty to fifty per week effective September 01, 1992 without any increase in wages. As the manager, the claimant was not allowed overtime wages. However, he was eligible for bonuses and other benefits. At the time of hire, the claimant understood that the em-

ployer was going to open a new restaurant at the military installation, and the claimant was going to move to that store. In the meantime, the claimant worked in a bus which had been renovated into a fast food operation. However, the employer elected not to proceed with a new restaurant at the military installation.

\*　　\*　　\*　　\*　　\*　　\*

The relevant issue in this case is whether the claimant's voluntary leaving was for good cause.

In this case, the evidence shows that the claimant voluntarily left his work because he was not satisfied with the working environment. He worked in a bus which had been renovated into a restaurant. Although he was assured of an appointment to a new store which had been planned at the military facility, the claimant found that the employer had decided not to establish a new restaurant there. Moreover, he was required to work additional hours from forty to fifty hours per week without any increase in wages. This resulted in a 23.07 percent reduction in hourly wages to $10 an hour from $13 per hour. Although the conditions of employment had changed substantially, the claimant knew, or should have known, that as a management individual, he would not realize any increase in wages for hours worked beyond forty hours per week. Absent evidence which shows that he was compelled to leave his work, I find the claimant voluntarily left his work for personal, noncompelling reason [sic] and therefore left without good cause.

*DECISION:*

The Department's determination is affirmed. The claimant is disqualified for benefits beginning September 20, 1992, and continuing until he is paid wages in covered employment equal to not less than five times his weekly benefit amount after September 26, 1992, on the basis that he voluntarily left work without good cause.

## DISCUSSION

### A.

Rife contends that the administrative hearing was not conducted upon proper procedure. We disagree.

 HRS § 91-9(c) (1993) requires that "[o]pportunities shall be afforded all parties to present evidence and argument on all issues involved." A "full hearing" has been defined as "[o]ne in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken[.]" *In re Kauai Electric Division of Citizens Utilities Company*, 60 Haw. 166, 182, 590 P.2d 524, 536 (1978) (quoting *New England Divisions Case*, 261 U.S. 184, 200, 43 S.Ct. 270, 277, 67 L.Ed. 605 (1923)). Our review of the record in Rife's case reveals that the Department satisfied HRS § 91-9(c).

### B.

 Rife contends that the agency's decision did not comply with HRS § 91-12. We agree. This failure by the Department to satisfy HRS § 91-12 results in the application of HRS § 91-14(g)(1).

Rife asserted three reasons for terminating his employment. Rife's first reason was the alleged dangerousness of the Bus. The Department did not expressly decide whether Rife satisfied his burden of proving that the Bus was dangerous and, if so, whether that dangerousness was a Rule 12-5-47(c)(1) change.

Rife's second reason was Employer's alleged lack of credibility in assuring Rife that a state-of-the-art unit would replace the Bus while not telling him of its decision to cease doing business at KMCAS. The Department did not expressly decide whether Rife satisfied his burden of proving that Employer deceived Rife and, if so, whether that deception was a Rule 12-5-47(c)(7) factor.

Rife's third reason was the undisputed increase of his hours per week from forty to fifty. The Department did not decide whether Rife satisfied his burden of proving that, when Employer hired Rife, it promised him that he would work only forty hours per week and, if so, whether the increase to fifty hours per week was a Rule 12-5-47(c)(2) change.

### CONCLUSION

Accordingly, we vacate the State of Hawai'i Department of Labor and Industrial Relations Employment Security Office's Decision No. 9203427 entered on November 30, 1992, and remand for action consistent with this opinion.